THE CHOTINER FIRM
By L. Kenneth Chotiner, LL.M.                                    Attorneys for Plaintiff
ID No. 77451
1818 Market Street, Ste. 3740
Philadelphia, PA 19103
215.564.6544

MASTER WEINSTEIN SCHATZ MOYER, P.C.
By STEVEN J. SCHATZ, ESQUIRE
ID No. 84509
1818 Market Street, Suite 3620
Philadelphia, PA 19103
215.561.2800



FILED
NOV 0 6 2013
MICHAEL E. KUNZ, Clerk
By_____Dep. Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| TAMIKA HINTON<br><br>                          Plaintiff<br><br>              Vs.<br><br>THE CITY OF PHILADELPHIA, POLICE OFFICER, NICHOLAS HALBHERR, BADGE NUMBER UNKOWN, POLICE OFFICER WILLIAM MATHIEU, BADGE NUMBER 9832, DETECTIVE JOHN HOPKINS, BADGE NUMBER 691, DETECTIVE VALENTINO, BADGE NUMBER 615, POLICE OFFICER CHRISTOPHER MCCUE, BADGE NUMBER 2905, POLICE OFFICER DAVID BENVIGNATI, BADGE NUMBER 3054, POLICE OFFICER NICHOLAS CION, JR., SERGEANT JAY MCCLAIN, BADGE NUMBER UNKOWN, AND POLICE OFFICERS JOHN DOE NUMBERS 1 THROUGH TEN, BADGE NUMBERS UNKOWN<br><br>                          Defendants | CIVIL ACTION<br><br>No.: 13-CV-4099<br><br>JURY TRIAL DEMANDED |

AMENDED COMPLAINT

I.      JURISDICTION

        1.      This action is brought pursuant to 42 U.S.C. Sections 1983, and 1985and 1988,
28 U.S.C. §§ 1331 and 1343(1),(3),(4) and the Fourth, Fifth, Sixth, and Fourteenth Amendments
to the United States Constitution, the Pennsylvania Constitution, and under the Common Law of

the Commonwealth of Pennsylvania. Plaintiff further invokes the supplemental jurisdiction of this Court to hear and decide claims arising under state law.

## II.     PARTIES

2.     Plaintiff, Tamika Hinton, citizen of the Commonwealth of Pennsylvania, who at all times relevant hereto resided at 7721 Dungan Road, Philadelphia, Pennsylvania.

3.     Defendant, City of Philadelphia, is a City of the First Class in the Commonwealth of Pennsylvania and a municipal corporation duly existing and organized under the laws of Pennsylvania with offices for service at 1515 Arch Street, Philadelphia, PA 19102. At all times relevant hereto, Defendant, City of Philadelphia, operated under the color of state law in creating and maintaining a Police Department and was the employer of all of the Police Officer Defendants in this action.

4.     Defendant, Police Officer Nicholas Halbherr, Badge No.: unknown ( "OFFICER HALBHERR"), was at all times relevant to this Complaint, an Officer of the Police Department of Defendant, City of Philadelphia, and was acting in such capacity as the agent, servant, and or employee of the City of Philadelphia, by and through the Police Department, acting under the direction and control of the City of Philadelphia and its Police Department, and was acting pursuant to either official policies, statutes, ordinances, regulations, customs, practices and usages of the City of Philadelphia and its Police Department. He is being sued in both his individual and official capacities.

5.     Defendant, Police Officer William Mathieu, Badge No.: 9832 ( "OFFICER MATHIEU"), was at all times relevant to this Complaint, an Officer of the Police Department of Defendant, City of Philadelphia, and was acting in such capacity as the agent, servant, and or employee of the City of Philadelphia, by and through the Police Department, acting under the direction and control of the City of Philadelphia and its Police Department, and was acting pursuant to either official policies, statutes, ordinances, regulations, customs, practices and usages of the City of Philadelphia and its Police Department. He is being sued in both his individual and official capacities.

6.     Defendant, Detective John Hopkins, Badge No.: 5180 ( "DET. HOPKINS"), was at all times relevant to this Complaint, an Officer of the Police Department of Defendant, City of Philadelphia, and was acting in such capacity as the agent, servant, and or employee of the City of Philadelphia, by and through the Police Department, acting under the direction and control of

the City of Philadelphia and its Police Department, and was acting pursuant to either official policies, statutes, ordinances, regulations, customs, practices and usages of the City of Philadelphia and its Police Department. <u>He is being sued in both his individual and official capacities</u>.

7.     Defendant, Det. Valentino, Badge No.: 615 ( "DET. VALENTINO"), was at all times relevant to this Complaint, an Officer of the Police Department of Defendant, City of Philadelphia, and was acting in such capacity as the agent, servant, and or employee of the City of Philadelphia, by and through the Police Department, acting under the direction and control of the City of Philadelphia and its Police Department, and was acting pursuant to either official policies, statutes, ordinances, regulations, customs, practices and usages of the City of Philadelphia and its Police Department. <u>She is being sued in both her individual and official capacities</u>.

8.     Defendant, Police Officer Christopher McCue, Badge No.: 2905 ( "OFFICER MCCUE"), was at all times relevant to this Complaint, an Officer of the Police Department of Defendant, City of Philadelphia, and was acting in such capacity as the agent, servant, and or employee of the City of Philadelphia, by and through the Police Department, acting under the direction and control of the City of Philadelphia and its Police Department, and was acting pursuant to either official policies, statutes, ordinances, regulations, customs, practices and usages of the City of Philadelphia and its Police Department. <u>He is being sued in both his individual and official capacities</u>.

9.     Defendant, Police Officer Nicholas Cion, Jr., Badge No.: Unknown ( "OFFICER Cion"), was at all times relevant to this Complaint, an Officer of the Police Department of Defendant, City of Philadelphia, and was acting in such capacity as the agent, servant, and or employee of the City of Philadelphia, by and through the Police Department, acting under the direction and control of the City of Philadelphia and its Police Department, and was acting pursuant to either official policies, statutes, ordinances, regulations, customs, practices and usages of the City of Philadelphia and its Police Department. <u>He is being sued in both his individual and official capacities</u>.

10.     Defendant, Police Officer David Benvignati, Badge No.: 3054 ( "OFFICER BENVIGNATI"), was at all times relevant to this Complaint, an Officer of the Police Department of Defendant, City of Philadelphia, and was acting in such capacity as the agent, servant, and or employee of the City of Philadelphia, by and through the Police Department, acting under the direction and control of the City of Philadelphia and its Police Department, and was acting

pursuant to either official policies, statutes, ordinances, regulations, customs, practices and usages of the City of Philadelphia and its Police Department. He is being sued in both his individual and official capacities.

11.     Defendant, Sgt. Jay McCain, Badge No.: Unknown ( "SGT. MCCAIN"), was at all times relevant to this Complaint, an Officer of the Police Department of Defendant, City of Philadelphia, and was acting in such capacity as the agent, servant, and or employee of the City of Philadelphia, by and through the Police Department, acting under the direction and control of the City of Philadelphia and its Police Department, and was acting pursuant to either official policies, statutes, ordinances, regulations, customs, practices and usages of the City of Philadelphia and its Police Department. He is being sued in both his individual and official capacities.

12.     Defendants, John Doe, Number One through Ten, are factitious names of individuals heretofore unascertained that were at all times relevant to this Complaint, Police Officers for the City of Philadelphia and acted under the color of state law. They are being sued in both their individual and official capacities.

13.     At all times material and relevant to this complaint, Defendant, City of Philadelphia, did act through its agents, employees, owners, representative, agents and/or employees while in the course and scope of their employment and/or agency.

14.     At all times referred to herein, Defendants, acted under color of the laws, statutes ordinances, regulations, policies, customs, and usages of the Commonwealth of Pennsylvania, the City of Philadelphia and the Police Department of the City of Philadelphia, and pursuant to their authority as police officers of the City of Philadelphia and its police department.

15.     At all times referred to herein, Defendants did conspire with one another, to deprive Plaintiff of her constitutional rights.

III.    **FACTS**

16.     In January 2009, the Philadelphia Police Department adopted a written policy that requires supervisors to remove from all police paperwork the names of police witnesses who possess exculpatory information. In pertinent part, that policy states:

> Platoon commanders will be required to review and initial all arrest and investigative reports, including PARS reports[1], to ensure that only those officers/investigators who are necessary for the successful outcome of the case are listed.

> (See Memorandum (09-01)(the "Policy"), §III. A. (1), attached as Exhibit "A.")

The meaning of the phrase "successful outcome" is so obvious that it is not defined further. Id.

Pursuant to the Policy, Police supervisors are required to remove from all police paperwork the names of any police officer that witnessed events, which would be useful by a defendant in a criminal case, because such officers would not "ensure" a "successful outcome." In other words, the City of Philadelphia, by and through its Police Department, has adopted a written policy to enforce a code of silence or "blue code," which prohibits Officers from intervening or providing truthful information against constitutional violations and other unlawful misconduct committed by their fellow Officers.

17.     On or about October 15, 2011, at approximately 9:00 p.m., Defendant, Officer Halbherr's, father and sister, had just left a bar where they had been drinking and were walking in the vicinity of 7700 Dungan Street, Philadelphia, PA.

18.     At the aforementioned date and time, Defendant, Officer Halbherr's, father and sister started a fight with Plaintiff's son that also involved a family friend.

19.     Plaintiff broke up the fight and called "911."

20.     Defendant, Officer Mathieu, was the first officer to respond to Plaintiff's "911" call.

21.     Then Defendant, Officer Mathieu, briefly spoke with Plaintiff before speaking with a neighbor who witnessed the attack started by Defendant, Officer Halbherr's, father and sister. (Even though the independent witnesses name appeared on the initial police paperwork, the Defendants, Detectives Hopkins and Valentino, made no attempts to obtain a statement from him because they knew his statements would exculpate Plaintiff and inculpate Defendant, Halbherr's, father and sister.)

---

[1] As the Court may be aware, the arrest and investigative reports, including PARS reports, are the police paperwork that is typically provided to an accused in a criminal case. It is this police paperwork that helps an accused identify, among others, police witnesses.

22.    The defendant officers who were at the scene also knew the independent witness said that Ms. Hinton should not have been arrested.

23.    The independent witness also stated that he thought he was going to be interviewed after the incident. However, that interview did not happen until September 5, 2012, after Plaintiff's counsel notified the Commonwealth that Plaintiff was going to call the independent witness in her case.

24.    After Defendant, Officer Mathieu, spoke with the independent witness, he spoke with Defendant, Officer Halbherr's, father and sister.

25.    Shortly thereafter, other defendants, including Defendant, Officer Halbherr, arrived.

26.    Defendant, Officer Mathieu, was one of the other officers who arrived at the scene and was aware that Defendant, Officer Halbherr's, father and sister were the aggressors and that Plaintiff should not be arrested.

27.    Defendant, Officer Cione, Jr., was another one of the other officers who arrived at the scene and was aware that Defendant, Officer Halbherr's, father and sister were the aggressors and that Plaintiff should not be arrested.

28.    Defendant, Sgt. McCain, was another one of the other officers who arrived at the scene and was aware that Defendant, Officer Halbherr's, father and sister were the aggressors and that Plaintiff should not be arrested.

29.    Even though Defendant, Officer Halbherr, was not on duty and did not witness any part of the incident, he spoke with some of the defendant Officers who were on scene.

30.    After Defendant, Officer Halbherr, spoke with some of the defendant officers who were on scene, Defendant, Sgt. McCain, told Plaintiff that the incident would be handled as a private matter.

31.    Defendant, Sgt. McCain, told Plaintiff that she, along with her son and family friend, could go to the station on their own or they could ride with police.

32.    At trial, Defendant, Officer Mathieu, admitted he did not arrest Plaintiff at the scene.

33.     Plaintiff, her son, and friend, decided to ride to the station with police.

34.     Prior to being placed in the patrol vehicle, police neither searched nor handcuffed Plaintiff, her son, or her friend.

35.     When Plaintiff, her son, and her friend arrived at the police station, they were escorted upstairs to speak with Detectives.

36.     After about 15 minutes, some of the defendants asked Plaintiff, her son, and her friend for identification.

37.     Said defendants took the identification and went back downstairs only to return a short while later and place Plaintiff's son in handcuffs.

38.     After he son was placed in cuffs, Plaintiff realized that she was not going to be able to get to be at work the next morning and went outside to make some telephone calls.

39.     At the time of the incident, Plaintiff was a correctional officer and called her partner to inform them that she would not be at work the next morning.

40.     After Plaintiff made her telephone calls, she went back inside and was buzzed in so she could go back upstairs to speak with detectives.

41.     When Plaintiff got upstairs, she saw a uniformed officer speaking with Defendant, Officer Halbherr, across from his father and sister, who were now sitting where Plaintiff had been sitting before she went out to make phone calls.

42.     She walked by and tried to speak with Defendant, Mathieu, and one of the defendant detectives but they told her to go away.

43.     As Plaintiff was walking back past the uniformed officer and Defendant, Halbherr, his father tried to trip her. Defendant, Halbherr, and the uniformed officer just laughed.

44.     Plaintiff walked back downstairs so that she could sit down.

45.     As Plaintiff was sitting near the bottom of the steps, she saw paramedics arrive and go upstairs.

46.     Thereafter, Plaintiff paramedics walked Defendant, Halbherr's, father and sister, passed Plaintiff. His sister snickered as she walked by.

47.     Approximately ten minutes after that, two plain clothes officers approached Plaintiff and asked her to stick her hands out and placed cuffs on her.

48.     The plain clothes officers who placed Plaintiff in cuffs were Defendants, Officers McCue and Benvignati.

49.     Plaintiff asked if she was being arrested, the officers said "no." They told Plaintiff that they were just going to place her in a cell, which was a lie.

50.     At trial, Defendant, Officer Benvignati, testified that he and his partner, Defendant, Officer McCue, received information from Defendant, Officer Mathieu, that Plaintiff was in an altercation and was to be taken into custody.

51.     Plaintiff was arrested and charged with Aggravated Assault, Conspiracy, Possession of an Instrument of Crime, Simple Assault, and Reckless Endangerment of Another person.

52.     Plaintiff was found "Not Guilty" of all charges.

53.     At the underlying trial, Defendant, Det. Hopkins, testified that his duties regarding the case were to compile the paperwork, interview witnesses at the scene and any other fact witnesses, and collect any evidence that needs to be collected. Moreover, Defendant, Det. Hopkins, testified that his duties include reviewing the incident report, which in this case, contained the name of the independent witness. Defendant, Det. Hopkins, also testified that he, through the investigation, decide who is going to be arrested and what charges are going to be filed through the District Attorney's Office.

54.     At trial, Defendant, Det. Hopkins, testified that he made a mistake by not interviewing the independent witness. However, Plaintiff believes and therefore avers that this was no "mistake."

55.     Plaintiff believes and therefore avers that the reason Defendants, Dets. Hopkins and Valentino, made no attempt to interview the only independent witness because Defendant, Mathieu, and/or other defendant officers told them that independent witness' statement would

exculpate Plaintiff and implicate Defendant, Halbherr's father and sister who were, according to the independent witness, the aggressors.

56.     Plaintiff believes and therefore avers that Defendant, Detectives Hopkins and Valentino, intentionally failed to interview the independent witness because of the witness' exculpatory statement, which was consistent with the Policy of enforcing the "Blue Code" by trying to ensure that there was no evidence indicating that the Defendants concocted a story in an attempt to protect Defendant, Officer Halbehrr's, father and sister.

57.     Plaintiff's belief that Defendants, Dets. Hopkins and Valentino, intentionally failed to interview the independent witness is based, in part, by the statement they obtained from Defendant, Officer Mathieu, wherein he failed to mention the independent witness. (Exhibit "B.")

58.     In that statement, Defendant, Officer Mathieu, tells the story defendants concocted to protect Defendant, Officer Halbherr's, father and sister.

59.     In that statement, Defendant, Officer Mathieu, claims he arrested Plaintiff's son at the scene, which is not true. (Id.)

60.     In that statement, Defendant, Officer Mathieu, makes no reference to the independent witness who told him that Defendant, Officer Halbherr's, father and sister were the aggressors. (Id.)

61.     In that statement, Defendant, Officer Mathieu, fails to mention that Defendant, Officer Halbherr's, father and sister were first brought to the district before they went to the hospital. (Id.)

62.     Instead, Defendant, Officer Mathieu, makes it appear that Defendant, Officer Halbherr's, father and sister were transported directly to the hospital. (Id.)

63.     Defendant, Officer Mathieu, also omits from his statement that Defendant, Officer Halbherr, arrived at the scene.

64.     Moreover, despite the fact that Defendant, Cion, Jr., was at the scene, he was not listed on any of the police paperwork and did Defendants, Dets. Hopkins and Valentino, did not take a statement from him or Defendant, Sgt. McCain, who was also on location.

65. It is believed and therefore averred that Defendant, Officer Cion, Jr., was not listed on the police paperwork pursuant to the Policy, which requires that the names of police witnesses with exculpatory information be excluded from the police paperwork.

66. It is also believed and therefore averred that Defendants, Dets. Hopkins and Valentino, did not take a statement from Defendant, Officer Cion, Jr., or Defendant, Sgt. McCain, pursuant to the Policy of excluding police witnesses with exculpatory information from the police paperwork.

67. As a result of Defendants' wrongful conduct, Plaintiff was unable to return to her work as a Correctional Officer.

68. Moreover, as a result of Defendants' actions, Plaintiff suffers from Post Traumatic Stress Disorder and other emotional injuries.

## FIRST CAUSE OF ACTION
## AGAINST DEFENDANT, THE CITY OF PHILADELHIA,
## PURSUANT TO 42 U.S.C. §1983
## (*MONELL* CLAIMS)

69. The allegations set forth in paragraphs one through sixty-eight inclusive, are incorporated herein as if fully set forth.

70. Prior to October 5, 2011, the City of Philadelphia, including but not limited to the City of Philadelphia Police Department, developed and maintained policies or customs exhibiting deliberate indifference to the constitution rights of persons in Philadelphia, which caused the violations of plaintiff's civil rights.

71. The City of Philadelphia has encouraged, tolerated, ratified and has been deliberately indifferent to the following patterns, practices and customs and to the need for more or different training, supervision, investigation or discipline in the areas of:

     a. The abuse of police powers, including but not limited to excessive force, unlawful detention, false arrest;

     b. The failure of police officers to follow established policies and procedures regarding the completion of police paperwork;

    c.   The failure of the Philadelphia Police Department to maintain proper police reports, including the identity of police eyewitness information;

    d.   The failure of police officers to prevent, deter, report or to take action against the unlawful conduct of other officers under such circumstances as presented herein.

72.    Defendant, the City, failed to properly sanction or discipline officers, who are aware and subsequently conceal and/or aid and abet violations of constitutional rights of citizens by other police officers, thereby causing and encouraging police, including the individual Defendants to violate the rights of citizens such as Plaintiff.

73.    It was the policy and/or custom of the City of Philadelphia, by and through its Police Department to inadequately and improperly investigate acts of misconduct by its officers, including defendant officer(s), such that these acts of misconduct were tolerated and known by the City of Philadelphia, including the incident involving plaintiff in this matter.

74.    It was the policy and/or custom of the City of Philadelphia and its Police Department to inadequately supervise and train its police officers, including the defendant officer(s), thereby failing to adequately discourage further constitutional violations on the part of it police officers. The City of Philadelphia, by and through it Police Department, did not require appropriate in-service training or re-training of officer(s) who were known to have engaged in propensities for violence, unlawful arrests, unlawful detainments and unlawful behavior and further police misconduct.

75.    As a result of the above described policies and customs, police officers of the City of Philadelphia and its Police Department, including the defendant officer(s), believed that his/their actions would not be properly monitored by supervisor officers and that misconduct would not be investigated or sanctioned, but would be tolerated.

76.    The above described policies and customs, police officers of the City of Philadelphia, by and through its Police Department, demonstrated an indifference on the part of policymakers of the City of Philadelphia and its Police Department to the constitutional right of person within the City of Philadelphia, and were the cause of the violations of plaintiff's rights alleged herein.

77.     The acts and failures to act of Defendant, City of Philadelphia, by and through its Police Department, committed under color of law, as herein above set forth, deprived plaintiff of her rights, privileges and immunities guaranteed to him as a citizen of the United States, in violation of 42 U.S.C. Sections 1983, and 1985, and deprived the plaintiff of rights guaranteed by the First, Fourth, Fifth, Sixth, and Fourteenth Amendments to the Constitution of the United States and the Pennsylvania Constitution.

WHEREFORE, plaintiff respectfully requests judgment in her favor and against defendants for compensatory and punitive damages, plus costs of this action, attorneys fees, and such other relief as this Honorable Court deems fair and appropriate under the circumstances.

## SECOND CAUSE OF ACTION
## INJUNCTIVE AND DECLARATORY RELIEF FOR
## CIVIL RIGHTS VIOLATIONS

78.     The allegations set forth in paragraphs one through seventy-seven inclusive, are incorporated herein as if fully set forth.

79.     By adopting, permitting, encouraging, tolerating, ratifying or being deliberately indifferent to a pattern, practice and policy pursuant to which defendants unlawfully and improperly withhold exculpatory evidence from police reports, defendants have and will continue to deprive plaintiff and other individuals who come into contact with police of rights guaranteed by the Fourth, Fifth, Sixth, and Fourteenth Amendments of the Constitution of the United States and 42 U.S.C. § 1983 and §1985.

80.     Defendants, by their actions, deprived Plaintiff and other individuals of their rights to life, liberty, and, property consistent with all rights and immunities guaranteed by the Due Process Clause of the Constitution of the United States.

81.     By adopting a policy that withholds exculpatory evidence from police reports defendants will continue to deprive plaintiff and others who may come into contact with police of rights guaranteed by the Constitution and 42 U.S.C. §1983 and §1985.

82.     Plaintiff "has standing to pursue claims for injunctive and declaratory relief to combat a pattern of illicit behavior, particularly when the challenged conduct occurs pursuant to an officially authorized policy." *McBride v. Cahoone*, 820 F.Supp.2d 623, 634 (E.D. Pa. 2011)

83.     "[T]he presence of an official policy greatly increases the likelihood that any individual, including [plaintiff], will imminently suffer the very same deprivation of liberty [plaintiff] claims to have suffered in the past. *Id.* at 635.

84.     Furthermore, Plaintiff currently experiences adverse effects because of the Policy, which allegedly sanctions the withholding of material information regarding the incident and possible witnesses, thus hindering Plaintiff's efforts to successfully pursue her claims.

85.     As a result of Defendants' conduct, plaintiff and other individuals other individuals who come into contact with police have suffered and will continue to suffer irreparable harm. There is no adequate remedy at law and the requested declaratory and injunctive relief are necessary to prevent ongoing civil rights violations.

WHEREFORE, plaintiff respectfully requests judgment in her favor and against defendants for declaratory and injunctive relief, plus costs of this action, attorney's fees, and such other relief as this Honorable Court deems fair and appropriate under the circumstances.

### THIRD CAUSE OF ACTION
### EXCESSIVE USE OF FORCE COGNIZABLE UNDER 42 U.S.C. §1983
### PLAINTIFF V. ALL DEFENDANTS

86.     The allegations set forth in paragraphs one through eighty-five inclusive, are incorporated herein as if fully set forth.

87.     At the time and date aforementioned, Defendants used unnecessary force on plaintiff by placing her under arrest. Defendants' actions were unnecessary, unlawful, outrageous and intentional, and constituted an unlawful physical assault upon plaintiff.

88.     As stated in the Third Circuit's Model Civil Jury Instructions:

> The Fourth Amendment excessive force standard attaches at the point of a "seizure." See *Abraham v. Raso*, 183 F.3d 279, 288 (3d Cir. 1999) ("To state a claim for excessive force as an unreasonable seizure under the Fourth Amendment, a plaintiff must show that a 'seizure' occurred and that it was unreasonable."). A "seizure" occurs when a government official has, "by means of physical force or show of authority, . . . in some way restrained [the person's] liberty." *Terry v. Ohio*, 392 U.S. 1, 19 n.16 (1968); see also *Brower v. County of Inyo*, 489 U.S. 593, 596 (1989); *Berg v. County of Allegheny*, 219 F.3d 261, 269 (3d Cir. 2000) (per curiam) ("A person is seized for Fourth Amendment

purposes only if he is detained by means intentionally applied to terminate his freedom of movement.").

<u>See</u> Third Cir. Model Civil Jury Inst. §4.9, Comment.

89.     Here, there is no doubt that Plaintiff was "seized" when Defendants, Officers McCue and Benvignati placed her in handcuffs through their show of authority as police officers while Plaintiff was in the Police Station.

90.     Moreover, Defendants conspired with one another and concocted a story that implicated Plaintiff in wrongdoing so that they could deprive plaintiff of her Constitutional right to be free from excessive force. Each defendant understood and knew that absent their cooperation the false story would have been discovered and Defendant, Officer Halbherr's, father and sister would have been arrested.

91.     Moreover, the story concocted by Defendants was supported by the Policy of withholding material information about the incident.

WHEREFORE, plaintiff respectfully requests judgment in her favor and against defendants for compensatory and punitive damages, plus costs of this action, attorney's fees, and such other relief as this Honorable Court deems fair and appropriate under the circumstances.

**FOURTH CAUSE OF ACTION**
**UNLAWFUL SEIZURE COGNIZABLE UNDER 42 U.S.C. §1983**
**PLAINTIFF V. ALL DEFENDANTS**

92.     The allegations set forth in paragraphs one through ninety-one inclusive, are incorporated herein as if fully set forth.

93.     Defendants conspired with one another and concocted a story that implicated Plaintiff in wrongdoing so that they could deprive plaintiff of her Constitutional right to be free from unlawful seizure. Each defendant understood and knew that absent their cooperation the false story would have been discovered and Defendant, Officer Halbherr's, father and sister would have been arrested.

94.     At the time Plaintiff was arrested Defendants knew that there was no probable cause to arrest because they knew that she had not done anything wrong.

95.    At the time Plaintiff was arrested, Defendants knew that Defendant, Officer Halbherr's, father and sister were the ones who had engaged in illegal conduct but wanted to protect their fellow officer's family.

96.    The fact that Defendants had no probable cause to arrest is supported by the fact that Plaintiff was not arrested at the scene by the police who arrived after she dialed "911."

97.    Instead, she was told by Defendant, Sgt. McCain, that the incident would be handled as a "private" matter and she would have to go to the station if she wanted to file a complaint.

98.    Based upon the story concocted by Defendants, Plaintiff was charged with some felonies, which is why they were able to arrest her at the station without a warrant for her arrest.

**WHEREFORE**, plaintiff respectfully requests judgment in her favor and against defendants for compensatory and punitive damages, plus costs of this action, attorney's fees, and such other relief as this Honorable Court deems fair and appropriate under the circumstances.

## FIFTH CAUSE OF ACTION
## FALSE ARREST AND IMPRISONMENT UNDER 42 U.S.C. §1983
## PLAINTIFF V. ALL DEFENDANTS

99.    The allegations set forth in paragraphs one through ninety-eight inclusive, are incorporated herein as if fully set forth.

100.    The conduct of defendants resulted in plaintiff being falsely, maliciously, and unlawfully arrested, detained and prosecuted, and plaintiff was deprived of his rights as secured by the Fourth and Fourteenth Amendments of the United States Constitution and 42 U.S.C. § 1983.

**WHEREFORE**, plaintiff respectfully requests judgment in her favor and against defendants for compensatory and punitive damages, plus costs of this action, attorney's fees, and such other relief as this Honorable Court deems fair and appropriate under the circumstances.

### SIXTH CAUSE OF ACTION
### MALICIOUS PROSECUTION UNDER 42 U.S.C. §1983
### PLAINTIFF V. ALL DEFENDANTS

101.    The allegations set forth in paragraphs one through one hundred inclusive, are incorporated herein as if fully set forth.

102.    Defendants violated Plaintiff's Fourth Amendment rights by initiating the prosecution of Plaintiff for the crimes of Aggravated Assault, Conspiracy, Possession of Instrument of Crime, Simple Assault, and Recklessly Endangering Another Person.

103.    Defendants lacked probable cause to initiate the proceedings against Plaintiff.

104.    The criminal proceedings ended in Plaintiff's favor.

105.    Defendants acted maliciously or for a purpose other than bringing Plaintiff to justice.

106.    In fact, Defendants conspired with one and another to concoct a story, which implicated Plaintiff in wrongdoing, to protect Defendant, Halbherr's, father and sister of being charge with a crime.

107.    As a consequence of the proceeding, Plaintiff suffered a significant deprivation of liberty.

WHEREFORE, plaintiff respectfully requests judgment in her favor and against defendants for compensatory and punitive damages, plus costs of this action, attorney's fees, and such other relief as this Honorable Court deems fair and appropriate under the circumstances.

### SEVENTH CAUSE OF ACTION
### STATE LAW CLAIM FOR INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### PLAINTIFF V. ALL DEFENDANTS

108.    The allegations set forth in paragraphs one through one hundred seven inclusive, are incorporated herein as if fully set forth.

109.    The unlawful actions of defendants were intentional and/or reckless, constituting extreme and outrageous conduct which caused plaintiff to suffer severe and foreseeable emotional and physical injuries to his person.

110.    Plaintiff re-alleges the damages as previously set forth.

**WHEREFORE**, plaintiff respectfully requests judgment in her favor and against defendants for compensatory and punitive damages, plus costs of this action, attorney's fees, and such other relief as this Honorable Court deems fair and appropriate under the circumstances.

## EIGTH CAUSE OF ACTION
### STATE LAW CLAIM FOR MALICIOUIS PROSECUTION AND ABUSE OF PROCESS
### PLAINTIFF V. ALL DEFENDANTS

111.    The allegations set forth in paragraphs one through one hundred ten inclusive, are incorporated herein as if fully set forth.

112.    Defendants falsely, maliciously, and with no probable cause arrested, charged, prosecuted, and initiated criminal proceedings against plaintiff in regard to the above mentioned incident.

113.    Defendants intentional, malicious, willful, wanton, reckless, careless, and negligent acts, conduct and/or omissions, were without probable cause and were brought and continued for an improper purpose.

114.    Defendants provided knowingly false and incomplete information in having plaintiff criminally charged and arrested, and intentionally and maliciously instituted, promoted, and participated in the confinement and prosecution of plaintiff. In so charging and alleging plaintiff of criminal action/behavior, defendants acted maliciously with the intent to injure the plaintiff, and is responsible for punitive as well as compensatory damages.

115.    Moreover, defendants' ulterior motives were in exercising the illegal, perverted or improper use of process by continued promotion and participation in the prosecution of plaintiff as to the charges brought against her.

116.    In so willfully, illegally, improperly and or perverting the use of process to accomplish a result outside its lawful scope against plaintiff, defendants caused plaintiff to suffer injuries to her person, property, and/or reputation as a result of their misuse of process.

117.    As a direct and proximate result of this malicious prosecution and abuse of process, plaintiff suffered damages as aforesaid.

WHEREFORE, plaintiff respectfully requests judgment in her favor and against defendants for compensatory and punitive damages, plus costs of this action, attorney's fees, and such other relief as this Honorable Court deems fair and appropriate under the circumstances.

## JURY DEMAND

118.    Plaintiff demands a jury trial as to each Defendant and as to each count.

WHEREFORE, plaintiff respectfully requests this Honorable Court grant the relief herein requested.

Dated: November 5, 2013

s/ L. Kenneth Chotiner
THE CHOTINER FIRM
L. KENNETH CHOTINER, ESQUIRE
Counsel for Plaintiff
1818 Market Street, Suite 3620
Philadelphia, PA 19103
215.564.6544

s/ Steven Schatz
MASTER WEINSTEIN SCHATZ MOYER, P.C.
STEVEN J. SCHATZ, ESQUIRE
Counsel for Plaintiff
1818 Market Street, Suite 3620
Philadelphia, PA 19103
215.561.2800

EXHIBIT "A"



PHILADELPHIA POLICE DEPARTMENT

**MEMORANDUM (09-01)** (01-28-09)

**SUBJECT: OVERTIME MANAGEMENT**

---

### I.   POLICY

A. Managing overtime costs are an essential element of supervisory and management responsibilities. The underlying goal of these procedures is to use overtime only when necessary; not to impede legitimate policing and investigative work. The following measures for all personnel in the Philadelphia Police Department (PPD) shall be implemented immediately. The purpose of these Department-wide procedures is to achieve uniformity in performance of our public service mission and to provide consistency in determining the need, use, distribution and management of overtime usage and in accordance with Directive 99 – "Overtime Pay and Compensatory Time" and Directive 13 – "Court Notices and Subpoenas."

---

### II.   PROCEDURES FOR NON-COURT OVERTIME

A. Following the end of each pay period, the Administrative Service Bureau shall provide an overtime monitoring report to each unit detailing the use of overtime by type. A department summary will be provided to the Police Commissioner.

B. The responsibilities set forth below outline general guidelines and procedures applicable to all police personnel receiving non-court overtime compensation, including but not limited to arrest, investigative and administrative overtime. These guidelines and procedures do not pertain to overtime used for special events or federally-funded task forces, unless otherwise ordered.

C. Staffing should be planned so that most cases require only essential overtime. When significant and recurring overtime is required, other alternatives should be considered such as redistribution of workload, postponement of the work, or the use of temporary help. Overtime pay should not be used as a means to provide supplemental pay to an employee.

D. Personnel members on less than full-duty status are not normally eligible for non-court overtime compensation. Exceptions may be requested through the chain of command for approval by the Deputy Commissioner for Organizational Support Services.


EXHIBIT
A

- 1 -

E. Commanders/Managers shall be responsible for approving non-court overtime for employees within their respective unit, division or bureau. Approval may only be delegated in the manner listed below.

1. The Commanding Officer/Manager may give discretion to Platoon Commanders to approve discretionary overtime for two (2) hours.

2. The Commanding Officer must approve all overtime greater than two (2) hours and up to six (6) hours.

3. The Divisional Commanders (Inspector) must approve all discretionary overtime greater than six (6) hours.

F. Commanders/Managers shall approve all overtime assignments prior to overtime being worked by police personnel. Advance authorization is required for overtime usage, unless exigent public safety and/or emergency conditions exist which necessitate approval after overtime usage has occurred.

G. The Request to Work Non-Court Overtime Form (75-57) shall be available to all employees within each unit, and be completed by the employee working overtime.

1. Upon written approval (signature) by the respective Commanders, or designee as outlined above, for each unit, the Request to Work Non-Court Overtime Form (75-57) shall be attached to the Daily Attendance Record (DAR).

2. Commanding Officers will collect, maintain and store all Overtime Authorization Forms in a manner consistent with the retention of the DARs as defined in Directive 115 – "Records Retention and Disposition Protocol."

H. Commanders/Managers shall be provided with a report at the end of each pay period for the purposes of monitoring and reviewing the use of overtime. Corrective action shall be taken as appropriate to ensure the appropriate use of overtime. This is an essential managerial task, and must be done in conjunction with the approval process for all employees within each respective unit.

III. PROCEDURES FOR COURT OVERTIME

A. Commanders/Managers shall also be responsible for reviewing and monitoring all court overtime for all employees in their respective units.

1. Platoon commanders will be required to review and initial all arrest and investigative reports, including PARS reports, to ensure that only those officers/investigators who are necessary for the successful outcome of the case are listed.

    2. All reports should clearly articulate the facts and circumstances of each case. Platoon commanders are responsible for ensuring that reports comprehensively capture the exact actions relevant to that case for each personnel member listed, including the supervisor.

B. Supervisors shall ensure that they are directing an investigation appropriately and not placing themselves in a position that will require their testimony at a later date. A supervisor shall, upon receipt of any court notices requesting his/her presence, make this court notice known to his/her Commanding Officer.

C. Assigned investigative supervisors maintain the overall responsibility for case management, including the number of police personnel involved in each case. When feasible, the lead investigator, or co-investigator, will assume responsibility for handing multiple components of each case, including collecting physical evidence, writing property receipts, taking statements, and assuming the role of affiant on the search or arrest warrant. The narrative description included on all search or arrest warrants should match these assigned roles and responsibilities.

D. All court notices, especially Preliminary Hearings, will be reviewed by platoon supervisors to determine whether the subpoenaed member is necessary. Attention should also be paid to the number of personnel subpoenaed for a particular case as well as the number of consecutive days personnel are required to attend the same case.

    1. Whenever there appears to be unnecessary personnel requested on a case, the supervisor will contact the Overtime Management Unit (215-685-3674 or 75) to refer the case for their review.

    2. Whenever there are six (6) or more personnel subpoenaed on the same case, the supervisor will contact the Overtime Management Unit to refer the case for their review.

E. When police personnel are subpoenaed for court on a Scheduled Day Off (SDO), the platoon supervisor shall initiate an immediate review of the case and arrest paperwork to determine the need for the officer's appearance. If it appears that the officer is unnecessary, the supervisor shall contact the Overtime Management Unit to refer the case for their review.

## IV.  COMPLIANCE

A. All personnel who receive overtime compensation shall participate in managing usage in a manner that is consistent with the procedures outlined in this memorandum. Accountability for overtime usage rests with every individual member of the Department.

- 3 -

B. This department-wide procedure sets the minimum requirements that all members must follow. Since the functions and responsibilities vary within each unit of the Philadelphia Police Department, bureaus may establish additional standard operating procedures (SOP). Such procedures shall not override the requirements stated here. All such SOPs shall be forwarded to the newly created Division of Standards and Accountability.

C. Unit commanders shall be responsible for the following:

   1. Approving overtime requests in accordance with the procedures outlined in this memorandum.

   2. Tracking the use of overtime by assigned personnel.

   3. Reviewing and monitoring all overtime usage for their respective unit on a monthly basis.

D. The Division of Standards and Accountability, under the Office of Operational Coordination and Accountability shall be charged with the following:

   1. Monitoring, analyzing and ensuring compliance with appropriate overtime usage protocols.

   2. Reviewing all unit-generated procedures on overtime management and providing corrective feedback to ensure compliance with this document.

   3. Identifying, analyzing and determining the appropriateness of individuals earning large amounts of overtime.

   4. Attend monthly COMPSTAT sessions for issues concerning overtime usage.

E. Overtime abuses or failures to comply with the above standard operating procedures shall be subject to disciplinary action.

---

**CHARLES H. RAMSEY**
Commissioner

| FOOTNOTE # | GENERAL # | DATE SENT | REVISION |
|---|---|---|---|
| *1 | 5671 (bt)  5672 (al) | 01-30-09 | Phone Number Change |

- 4 -

EXHIBIT "B"

| INVESTIGATION INTERVIEW RECORD | | PHILADELPHIA POLICE DEPARTMENT NORTH EAST DETECTIVES | | CASE# 11-15261 |
|---|---|---|---|---|
| | | | | INTERVIEWER: DET. VALENTINO #615 |

**NAME**
P/O William Mathieu # 9832, PR# ~~████~~

**AGE** 1

**RACE/SEX** W/M

**DOB** 1/1/01

**ADDRESS**
2nd District

**APT#**

**PHONE#** 215-686-3020

**SS#**

**NAME OF EMPLOYER / SCHOOL**
Philadelphia Police Department

**ADDRESS OF EMPLOYER / SCHOOL**
2nd District-

**PHONE#** 215-686-3020

**DATES OF PLANNED VACATION / BUSINESS TRIPS**

**NAME OF CLOSE RELATIVE**

**RELATIONSHIP**

**ADDRESS OF RELATIVE**

**PHONE#**

**PLACE OF INTERVIEW**
NORTH EAST DETECTIVE

**DATE** 10/5/11

**TIME** 12:30am

**BROUGHT IN BY**
Self

**DATE** ~~10/5/11~~ 11-5-11 ⅃√

**TIME** 11:45pm

**WE ARE QUESTIONING YOU CONCERNING:**

**WARNINGS GIVEN BY:**

**DATE**

**TIME**

**ANSWERS:**

| (1) | (2) | (3) | (4) | (5) | (6) | (7) |
|---|---|---|---|---|---|---|

Q. I am Det. Valentino #615. Please tell me about your response to 7700 Dungan Road.
A. I was working RPC# 233. I responded to a radio call of a meet complainant-complainant assaulted by neighbors. I pulled up on location. I observed all the parties in the back alleyway having a verbal dispute between them. I turned my attention toward the complainant and his daughter. The complainant, Joe Halobherr was bleeding all over his face and his face was swelled up. I observed the daughter's left eye with a large bruise. I asked the complainant what had happened and he pointed to two females, later determined to be Delores Graham and Tamika Hinton and stated that he had words with them and Timika's son, later determined to be Rasul Hinton came out and began punching in the face numerous times. The daughter told me that Delores and Tamika had assaulted her. I asked Tamika where her son Rasul was and she said that he was in the house. I called for back up so that I could affect an arrest. As I entered the house I discovered that Rasul had fled the scene. Tamika then called her son on cell phone and he came back apprx. 10 minutes later and I arrested him.

Q. Did you observe any injuries to Rasul, Tamika or Delores?
A. No.

Q. Did anyone tell you what the argument was about?
A. Tamika stated that the complainant and his daughter were in the alleyway yelling at each other and Tamika told them to keep it down and they became involved in a fist fight.

Q. Is there anything else you would like to tell me that I didn't ask?
A. Both complainants were transported to Aria Health Torresdale by Medic # 32



EXHIBIT "B"

| RECORD   YES   NO | CHECKED BY: P/o ~~William Mathieu~~ #9832 |
|---|---|
| REVIEWED BY: | |

76-483

## CERTIFICATE OF SERVICE

I, L. Kenneth Chotiner, Esquire, attorney for the Plaintiff, hereby certify that on this date the foregoing Amended Complaint, was served via regular mail, postage prepaid, and/or electronic filing to the following:

> Amanda C. Shoffel, Esquire
> Deputy City Solicitor
> City of Philadelphia Law Department
> 1515 Arch Street, 14th Floor
> Philadelphia, PA 19107
> Attorney for Defendants

> THE CHOTINER FIRM

Dated: November 5, 2013          s/ L. Kenneth Chotiner
                                 L. KENNETH CHOTINER, LL.M.
                                 Counsel for Plaintiff
                                 1818 Market Street, Suite 3740
                                 Philadelphia, PA 19103
                                 215.564.6544

11